Case number 20-1283, et al. New York Power Authority, Hudson Transmission Partners, LLC, Petitioners v. Federal Energy Regulatory Commission. Mr. Downsend for the petitioners, Ms. Chu for the respondents, Mr. Longstreth for the respondent intervener. Good morning, your honors. My name is Lucas Townsend, and I'm arguing for petitioners, Hudson Transmission Partners and New York Power Authority. And with the court's permission, I'd like to reserve 2 minutes for rebuttal. The orders on review require Hudson and its customer, the New York Power Authority, to pay roughly $12 million per year for 40 years for rights they do not actually have and benefits they no longer receive. Plain language of the controlling tariff, the PJM tariff, forbids this result. And I'll begin with the lower voltage projects, which represent the lion's share of the contested costs in this case. The lower voltage projects are governed by a provision of the PJM tariff, Section B10-B2, and it's found at Joint Appendix page 499. And the relevant language says this. It says, transmission provider shall base the collection of transmission enhancement charges associated with required transmission enhancements from a merchant transmission facility on the actual firm transmission withdrawal rights that have been awarded the merchant transmission facility. That's at JA-499. In other words, the collection of charges from a merchant facility shall be based on its actual firm rights, not prior, not deemed, but actual. So if there are no actual firm rights, there cannot be a collection. The fundamental error that the agency makes in this case and in the orders below is that it conflates cost assignment with collection. Those terms do not mean the same thing. And this court held as much just last year in a strikingly similar case, Long Island Power Authority versus FERC, 27F4705. And in that case, this court addressed the meaning of the word collected in another provision of the PJM tariff relating to merchant facilities. That provision was Schedule 12C. In that case, if charges were collected, then the merchant facility would be responsible for adjustments under that provision of the tariff. And FERC had argued that the word collected in that case meant to accrue liability for the assignment of costs. This court rejected FERC's interpretation in that case, and the court relied on the plain meaning of the word collected, collect as meaning to call for and obtain payment of. That's at page 716 of the LIPA decision. And the court said FERC has not identified a single example in a dictionary or otherwise where collect means to accrue liability, nor have we found any. And the court also found support in the surrounding provisions of that tariff provision. There are provisions in that case that called for deferred charges. There's a difference between what was collected and what the settlement called for, and they were essentially deferred charges. But that section seems different, right, from what we have here. I mean, subsection B is about when there are less firm rights than when a company has less firm rights than they will eventually have. It doesn't speak to the situation here where there are where there are no firm rights, you know, at the time the costs were assigned. So that doesn't that analogy doesn't seem to work here. Well, I think this provision actually I mean, it's it's the facts are slightly different and the wording is slightly different, but I think that the analogy does hold up because this provision is a parallel to the one that was discussed in the Long Island Power Authority case. The tariff provision at issue in this case, section 12B10, defines the difference between what is assigned and what can be collected, and it's defined as a deferred charge. And that deferred charge shows up in the account books of PJM, the grid administrator, the grid operator, as something that is kept track of. Eventually, it may become due, but it cannot be collected except on the basis of actual firm rights. In this case, there are zero firm rights, no actual firm rights. Under the plain text of this provision and the meaning of the word collected, there can't be collection of those charges unless and until there are firm rights. And in the meantime, they are just deferred charges. But that's why this isn't really an analogous situation, right? I mean, you know, here, the lower voltage facilities charge was calculated using the old method, right? The violation-based defects, right? And that was set at a certain time. You know, it was like the charges for those firm rights. And so how do you get out of those charges now? Well, so this goes to the distinction between what is assigned and what is collectible. So the provision that sets those charges that the commission has relied on is provision A-5, and it says, except as the relevant language says, and this is in page JA-489, except as specifically set forth herein, nothing in this Schedule 12 shall change the assignment of cost responsibility or classification of required transmission enhancements included in the tariff Schedule 12 appendix. And the argument is that those listed assignments are fixed and unchanging. And our position is that under 12B, it's entirely possible that those are fixed and unchanging, and yet 12B10B2 still applies to make those charges uncollectible. They're uncollectible, and they show up as deferred charges under the procedures that are surrounding 12B10B1. And 12B10B3 provide for deferred collection. If I agree with what Judge Rao just said about BXB2, BX, but I think FERC didn't rely on that reasoning in its decision making, what do I do with that? Well, FERC didn't have really any reasoned rationale that can be upheld in this case. FERC simply said that 12B10B2 doesn't apply, full stop. They read 12A-5, said that applies, and they simply didn't grapple with the text of 12B10B2. In that instance, it's the failure of reasoned decision making, and the orders have to be set aside under the APA as arbitrary and capricious. And we would submit that the plain text, the unambiguous text of 12B10B2, forbids the collection of these costs. So it's not something that the agency can reinstate on remand. This court has already done the work in the Lima case to determine what collect means in a strikingly similar context. If B10 does what you say, why did Con Ed need B11? So B11 was put into the tariff as a result of a settlement, a 2009 settlement with Con Ed. It involved a number of parties, not Hudson, not the New York Power Authority. But that was addressed in a separate proceeding, and part of that proceeding resulted in an amendment to the tariff. I get all that. I mean, I follow that, but all that can be true, and it could still be the case that if B10 does the work you say it does, Con Ed could have just relied on B10 being added to the tariff and wouldn't have needed B11 to be added to the tariff. B10 is a provision specific to merchant transmission facilities, and so Con Ed is a utility. It's also an entity outside of the PJM region, so it required its own special provision here as a result of the settlement. This B10 is only with regard to merchant transmission facilities, and there are just three of those. How does B10, though? I mean, so I guess A5, right under the effective date, says very clearly, except to specifically set forth here and nothing in the Schedule 12 shall change the assignment of cost responsibility in Schedule 12 appendix, right? So how does B10 do that work of specifically allowing for a change to the Schedule 12 appendix? I think that it's a tough read. So I would say two things. First of all, that we don't even need this as an exception because it's possible to read both of those provisions. They address different topics. The A5 addresses assignments. B10, B2 addresses collection, different topics. If we are talking about a reallocation of the jargons. Well, if it says you can't change the cost responsibility, but then you're just going to read B10 to say, oh, well, we're not changing the responsibility. We're just changing the selection. I mean, well, not a little bit. I mean, it's not maybe clever, but I don't know. Not at all, Your Honor, because that's what the tariff actually provides. It provides for deferred charges. It contemplates that charges can be assigned, but not collectible. And they go on to the accounts of PJM. I'll quote the language in particular. This is section 12, B10, B1. Transmission enhancement charges allocated to a merchant transmission facility. So allocated for which collection is deferred in accordance with this section shall be recorded in appropriate transmission provider accounts for deferred charges and collected in accordance with the procedures set forth in three. That's a JA-499. So the tariff itself defines the difference between what is assigned and what can be collected. And it was exactly that same situation also existed in the LIPA case. This is a common. What matters to you is collections and not assignments? Does that hurt your opinion 503 argument? Because I think opinion 503 talks about assignments. We have a separate argument that there should be a reassignment as well. And so if we can step back and just remember how this arose. This arose because PJM made a compliance filing and it proposed to change the assignments and zero out the costs for merchant transmission facilities that no longer had firm rights. And that was we submit that was correct as well under the commission's precedent. Exactly the same thing happened with respect to the Con Ed settlement. Con Ed allowed its firm service to expire. And at that point, and there is a provision that in the tariff that allows for the costs allocations to go to zero for Con Ed. There is no provision in the tariff, though, for reassigning those costs on to other parties. And what happened was PJM just proposed a prorater reallocation at that point on all other parties and FERC approved it. That methodology is not in the tariff. PJM proposed exactly the same prorater reallocation for Hudson and for NYPA in this case. And FERC said no. And we submit that that was error. That was inconsistent with FERC's longstanding policy, both under the Con Ed example and also under opinion 503, which recognizes that costs can only be assessed on merchant transmission facilities to the extent of their firm rights. Are you making an argument that FERC failed to treat like cases alike? Yes, with respect to the. Well, with respect, it's the departure from longstanding policy. The longstanding policy is that only merchant facilities with firm rights can be assigned costs, can be assessed costs. And that was true in opinion 503. It was also true with respect to the policy that the December 15th, 2017 orders that allowed Hudson and Linden to convert from firm rights to non firm rights. And it was also consistent with the with the practice in immediately following the Con Ed settlement. The 2017 order says that, you know, you can't impose the solution based defects going forward. But solution based defects is sort of, I mean, by definition, it's sort of an ongoing charge. So it makes sense that you can't continue to allocate the solution based defects without any firm rights. But that doesn't necessarily tell us what to do about the violation based defects charges that were imposed at a set time. Well, that's where we again go to the Con Ed example. So the costs that were reallocated were the supposedly fixed costs. Our fixed costs went up after the Con Ed settlement. There was no methodology whatsoever. And PJM did a. Do you raise a like cases alike claim in your brief? I didn't see that. Well, that's a distinct claim under case law, a distinct kind of arbitrary and capricious agency action. It's within our argument that that FERC has disregarded its longstanding policy. And we do rely on the Con Ed example as an instance where the agency did approve this exact reallocation and then didn't allow for that reallocation in our case. But that, again, goes to the reallocation point. And there's a separate point about whether the allocated costs are collectible, because it's entirely possible that the Schedule 12 appendix allocations are fixed and unchanging, but they can't be collected. And that's what 12B10B2 says. You indicate you don't receive any more benefits. That's how you started out. Go a little bit more there. Certainly, Your Honor. So the measure of benefits is firm transmission withdrawal rights, and those rights are special because they can't be curtailed except in very extreme circumstances. And that is the traditional measure in Opinion 503 of the benefit that a merchant transmission facility draws. That incidental benefits, whatever incidental benefits parties draw from changes made out in the grid somewhere, some of these projects are in the Chicago area, hundreds of miles away. Incidental benefits aren't the basis for cost allocations under this tariff and under Opinion 503. So the argument that I think the other side has made is that there are still incidental benefits coming from these projects, but those aren't the measure of benefits under Opinion 503. And they aren't a basis for cost allocations. And we have paid, Hudson has paid very extensively for interconnection. They paid $335 million to interconnect to the PJM grid. That investment is completely lost. We walked away from that in order to stop the bleeding in this case, but all of those improvements are still in the PJM grid. We also paid for firm rights when we had those firm rights in the period where we had those. We pay a separate rate called the border rate, which is an export rate. We also pay for the electricity. So whatever incidental benefits can be said to be drawn from the grid, we've paid for. We've paid for and the firm rights are the only measure for cost assessments under this provision. I'm over my time. If I am happy to. That's fine. I'm happy to answer a question. Yes. I think that your brief says that you didn't acquire the firm rights until 2015. Is that right? The full allocation of firm rights was in 2015. Maybe that's the answer to my question, but the violation-based costs were assessed from 2007 to 2013, I think. I believe the costs were assessed from 2013 to present. The projects were planned from 2007 to 2013. So that was the planning period for the projects. But then the costs get assessed after you have acquired your firm rights. Correct. That's correct. I'm happy to address economic projects briefly if there are any questions. You can say a little bit about that. Yes. The relevant provision for the economic projects is 12-5C. So there are three types of economic projects, A, B, and C. And 12-5C governs the projects at issue here. That provision does not mention merchant transmission facilities. In contrast to A and B. A and B say costs can be allocated to zones and merchant facilities. C says merchant facilities, full stop. There's no provision for the allocation to merchant transmission facilities. Now, the way that FERC has justified the cost assignments is to say, well, merchant facilities are like zones. But they're only like zones if they have firm rights. And that's the policy of opinion number 503. If they have firm rights, if merchant facilities have firm rights, then they have a demand on the system, a load on the system, and can be assessed costs on that basis. But when they have no firm rights, there's no basis, there's no policy for treating them like zones. And the absence of the word merchant transmission facility in this provision should be respected. There should not be an ongoing cost assessment for these projects, some of which are in Chicago. I mean, some of them are hundreds of miles away, and we're still paying for them. So I take opinion 503 to suggest that if a merchant transmission facility imposes a load, that's sufficient for the merchant transmission facility to be treated as a zone. But it doesn't necessarily mean that the load is necessary. I mean, maybe a merchant transmission facility can be treated as a zone, even if it doesn't impose a load. Maybe that question just hasn't been decided by FERC. Well, I think the language I'm referring to is footnote 84 of opinion 503 and the surrounding text. And there it says that a merchant transmission facility can be treated, can be assessed costs to the extent of its firm transmission withdrawal rights. And then it says it can avoid these cost assessments if it takes non-firm rights, only non-firm rights. Non-firm rights are essentially the ability to participate in the daily spot market for electricity. It's not a guaranteed or stable source of electricity. And that's the language in opinion number 503 that draws the distinction between firm rights, which can support cost assessments, and non-firm rights. So you read 503 to say that a merchant transmission facility can only be treated as a zone if it has firm rights. Yes, that is. And it forecloses the possibility it could be treated as a zone. Well, I'm not suggesting that the agency can't come up with a rationale for imposing costs otherwise, but they haven't done that in this case. They have not justified their departure from longstanding policy. The orders under review certainly don't do that. I'm happy to answer any other questions or address questions. Thank you. Thank you. Good morning. May it please the court. Susanna Chu for the Federal Energy Regulatory Commission. Your honors are correct that this is not analogous to either the Long Island power case or the consolidated Edison decision. We're talking about pre-existing fixed cost allocations that were established and are not subject to cost reallocation. We were talking a little bit about the New Jersey board decision that was part of the consolidated Edison decision that came out in August 2022. I think it's important to remember that that case involved the solution based defects allocations. And that refers to a particular provision in the tariff where the solution based defects calculation is done. And it's it uses as a multiplier the firm withdrawal rights of a merchant transmission facility. So that's why the commission found in the court upheld that Hudson and other merchant transmission facilities that had given up their firm rights were not obligated to pay these reliability upgrade costs on a going forward basis. But none of that, none of the firm rights at issue there are relevant to the cost allocations that were at issue in the PJM compliance filing that triggered this litigation. Going back to the language of Section A5, it says that these projects that were selected and planned by PJM in the 2007 to 2013 period are fixed and they shall not be changed except that specifically set forth herein. But that is except the specifically set forth here in language does refer to the Con Ed provision at the tariff schedule 12B11. Mr. Townsend's argument that that is about the assignment of costs, not the collection of costs. What do you think about that distinction? I think that is a false distinction. The discussion of collection in the Long Island power case is not relevant here. I think the history of that provision, B, Roman at 10B2, shows at Judge Rao, as you were describing earlier, that provision actually addresses situations where a merchant facility does not have its full complement of firm rights. Just as Mr. Townsend was describing, the situation where Hudson had signed an interconnection agreement in 2010 for 320 megawatts of firm rights, but did not yet receive the full complement of those firm rights until 2015. That is the situation that B10B2 is designed to address, and I think that is shown at opinion 503 paragraph, I'm sorry, JA145. And there's even a PJM compliance filing in response at JA281 to 283, showing that that's where provision B10B2 comes in. It is to address that mechanical situation where a merchant is entitled to receive a certain number of firm rights, but it's not yet in service and doesn't yet have revenue coming in. And so PJM defers the collection of costs until the merchant facility has revenue coming in and is able to pay that amount. What about Mr. Townsend's argument that the decision here is different from what happened in Con Ed and is contrary to FERC's policies and other instances when someone converts from firm to non-firm rights? Right, Your Honor. So to the extent it was that argument was made, this is different from the Con Ed situation because the Con Ed settlement agreement, which was described at the consolidated Edison decision at 45 FedForce 287, that was a 2009 settlement agreement, and it was incorporated into the tariff at section B11. Is that what they wanted to do here? I mean, here PJM and Hudson agreed, right, to release them from, you know, to prevent the collection or the assignment of those funds going forward. But FERC disagreed. Well, a couple of things there, Your Honor. FERC refused to ratify the agreement that the private parties had come to. No, there was no agreement between Hudson and PJM. In fact, the compliance filing by PJM actually says that PJM was unsure about what to do with these pre-existing cost allocations in the wake of the commission's 2017 order that was affirmed in New Jersey board. At JA 6 through 7, PJM actually says that there are no provisions in Schedule 12 that permit PJM to reallocate cost responsibility for economic projects below 500 kilovolts or cost assignments allocated using violation-based defects. So PJM said that there are no provisions, but they were still making a good faith effort to try to implement the commission's orders. But they agreed, didn't they, with Hudson? No, they did not, Your Honor. No, they proposed to eliminate the cost responsibility. I mean, is that agreeing with Hudson? Oh, well, but they said that, you know, we're just making a good faith effort to implement the commission orders. And after that, they did not disagree with the commission orders. They actually appeared as an intervener in support of FERC in this case, although they did not file a brief. So, and I want to say that there was not an agreement there, but also — I don't understand. I mean, they said we're not going to charge Hudson. And presumably Hudson didn't want to be charged. So it seems like they agreed. Right. Okay. Yeah, well, Your Honor, I don't mean to be splitting hairs here. PJM said that we're not sure how to implement, but this is our good faith effort to implement. But what they brought forth to FERC was Hudson's proposal to get out from the fixed costs. That's what they put forth in their filing, isn't it? That is true, Your Honor. Okay. I'm just trying to clarify that they — it wasn't — PJM did not say we think — I'm saying that they weren't fully on board, but they were actually filing that — they were filing it with FERC. That's right, Your Honor. They did file with FERC. They just weren't fully on board. They expressed uncertainty. And I can't tell you what the legal consequence of that is. I think it's just — Do you agree that there is no — I think that's probably right, Your Honor. So just rolling — going back to the Con Ed settlement, that provision, the last sentence of B11, it specifically talks about adjusting cost responsibility assignments at the commencement and transmission of — excuse me, at the commencement and termination of service under the Con Ed service agreements. And in fact, that settlement agreement was before the court in the New Jersey Board and Consolidated Edison cases. The actual settlement agreement is very specific. Upon commencement of Con Ed service agreements, the cost responsibility, the cost allocations under Schedule 12 appendix are actually going to be changed to incorporate responsibility for Con Ed. And upon termination, those same allocations will be eliminated to account for Con Ed's termination. I know that that is the prior case, but it is in the New Jersey Board joint appendix at Volume 4, JA 615. And that does provide the additional background. Isn't the only difference, though, between those situations whether FERC agreed? No, I don't think so, Your Honor. I mean, I think there's a difference in that there's the specific settlement agreement that is — that FERC agreed with, yes. But that is incorporated into the tariff, and that is the except the specifically specified here, and that falls under the A5 language. So are you saying that the agreement that PJM and Hudson came to was not the type of settlement that could have been incorporated into the tariff? I don't think there was a settlement agreement. But maybe there wasn't a formal settlement? Are you saying it wasn't formal enough? It wasn't a settlement agreement. The Con Ed settlement agreement involved numerous parties. It was Con Ed, PJM, the New Jersey Board. I don't recall all of the parties, but there are numerous parties to that settlement agreement. It was a huge agreement. There was no such settlement agreement here. But there was some agreement between PJM and Hudson. Again, I think it was PJM happened to agree with Hudson's view. They proposed to eliminate the responsibility because they were just trying to implement the commission orders. And can you respond to the question I asked earlier about the benefits? Oh, yes, Your Honor. So that kind of goes back to the fact that the Section A5 provision, that those allocations are assigned under a different methodology. It doesn't measure present benefits the way the solution-based DFACs does. It actually measures who caused the reliability violation that necessitates the new upgrade. It is described in the commission order, but there's also testimony in the joint appendix. And that is at Joint Appendix 361. And it's a good overview of what makes the violation-based method different from solution-based method. It is also in the order at footnotes 8 and 10 at JA92. And you also indicated that Hudson should be assigned load regardless of their— Yes, I'm sorry. Yes. I meant to bring out that Hudson is still a customer within PJM. It is still drawing power from the PJM grid. And as to—certainly as to those economic constraint projects, they are still obtaining relief in the form of lower congestion payments, load energy payments. So they are still receiving benefits. They're still part of the PJM system. And they're still bound by these tariff provisions, especially A5, that are fixed. And they were not affected by any of the subsequent developments that were at issue in the prior case. And I was also asking about whether or not Hudson—you were indicating that they should still be treated as load regardless of their firm withdrawal rights. That's right, Your Honor. The commission—well, the commission held that Hudson is still treated as a zone for purposes of these cost allocations, yes. And how do you determine at what time that occurs? Well, Your Honor, the timing is not really at issue here because we're talking about a specific set of projects that were previously cost allocated. It's the specific projects that are in the PJM compliance filing. So they were—you know, these projects were assigned to Hudson at a time when they held firm withdrawal rights. So the fact that they later relinquished them doesn't change the fact that they incurred this cost responsibility, and they continue to have this cost responsibility as a customer in PJM. What if Hudson were not a customer anymore? Would they still be on the hook for all these charges? That's a good question, Your Honor. To be honest, I'm not—I'm not sure. Do you mean if Hudson disconnected its line and left PJM altogether? I'm not sure. I mean, in that scenario, it may be—I would suspect the parties would discuss that, and there may be a provision in their interconnection agreements that addresses that. It seems like the kind of logic of your argument about the violation-based costs would suggest that they would still be on the hook. I agree, Your Honor, that the logic would say that they probably would still be on the hook, but I don't know if there's a specific provision in their interconnection service agreements or any other agreements they may have that may actually address what happens if they disconnect their line. There's a line in your brief at page 30, and it's back-to-back sentences, and I just wasn't sure how they fit together. Are you there? The FERC brief, Your Honor, yes. Yes, your brief. You say that Hudson's firm rights were a proxy for a load, but in the next sentence, you say that firm rights have no relationship to allocations for economic projects, which are based on changes in energy load payments. So it sounds like you're saying firm rights are relevant in the first sentence, and then you're saying they're not relevant in the next, but I suspect that's not really what you're trying to say, so tell me what you're really trying to say. I apologize for any lack of clarity, Your Honor. I mean, I think our reasoning is really in the second sentence, that the economic constraint projects, those are cost-allocated. They're allocated, and I may not be able to very accurately describe the specific calculation, but they're calculated once, and then they're done. So they calculate forward 15 years the change in the load energy payments that a facility receives as a result of a new upgrade, and then they bring it down to the net present value and allocate those costs among the benefiting parties. So what the commission was saying is that this particular provision, it just relates to the congestion relief benefits and these financial benefits. It just doesn't have to do with the firm rights. Then how do you square that with the sentence that precedes it, where you say that the firm rights are a proxy for load? I think that's really relevant, too. It's a more general point that, going back to opinion 503, where the commission had talked about, and that was in 2009 at a time when merchant facilities that had firm rights were considered unlikely to give them up. So their firm rights were used when a calculation called for the amount of load. They would use the amount of the firm rights. So I'm sorry if those two sentences don't really fit together all that well. I'm grateful for the clarification. Can I ask about opinion 503? I think if I were a owner of Hudson or something like that, and I read opinion 503, which was issued at a time when there were no solution-based costs, I think. Right. That's right, Your Honor. So it kind of had to be talking about violation-based costs. And I read opinion 503, and it sounds like I can avoid these costs if I opt out of my firm rights. And in particular, it says the cost allocation provisions in Schedule 12 provide that a merchant transmission owner does not own firm rights, does not receive cost responsibility assignments for RTEP projects. So, I mean, why would I have been wrong to read that and think, okay, if I want out of these cost responsibility assignments, I just need to opt out of my firm rights? Well, going back to the initial choice as to whether to opt in for firm rights or not opt in, I mean, if you do not opt in at all, then there would be no cost assignments. What happened here is that once PJM shifted over to the new solution-based DFAX method, PJM implemented a firm cutoff, and that was Section A5, that as of February 1st, 2013, all of the violation-based costs are fixed and they shall not be changed. And it's important to remember the violation-based costs, they're allocated based on – they're like a snapshot in time. It's who has caused the need for a specific reliability upgrade. And it's explained, I believe, in the testimony I cited earlier, JA361, that the violation-based method cannot be rerun. It's not like solution-based DFAX, which is done every year. But when CONED's violation-based costs were reallocated – Right, but they – well, they weren't – right. They were not re-calculated, shall I say. Yes, they were – when CONED terminated, yes, their allocations were just eliminated, and the remaining costs were reassigned. As a practical matter, the same thing could happen here. Yes, as a practical matter, that is possible. But the commission held that that wasn't appropriate in this situation because there was no settlement like the 2009 CONED settlement and no provision like the CONED provision. What if I think your explanation of the conflict between what happened here and Opinion 503 is persuasive, but I don't see that explanation in FERC's order? Well, I think it is, Your Honor. I mean, I think the order does refer to the CONED situation and the CONED provision. It's at paragraph 24. It's actually on Opinion 503. It's pretty cursory. Right. Well, 503 is really the backdrop to all of this. I mean, the commission, of course, is not addressing these issues in a vacuum. I mean, the commission has been navigating these issues for over a decade, or it's been a very long time. So Opinion 503, you know, that is, I believe, front and center in the commission's mind. I believe it is cited. And at the rehearing order at paragraph 24, I think that's where the reasoning is. I think it is there, Your Honor. I think it's discernible from the order. Well, and then I think this will be my last question. But if it's as cursory as I think the 503 discussion was, it's at least longer than the cost causation analysis, which I think is not there at all. And I think maybe your argument is, well, it didn't need to be there, because we've done all of this before. This is not a different situation, right? That's right, Your Honor. But if it's not a different situation from, for example, Opinion 503, then it seems like, fine, let's apply the general rule from Opinion 503, which says if you don't have firm rights, you don't pay violation-based costs. I'm sorry, Your Honor, if I lost you there. I think that you're talking about the A5 projects here, right? The violation-based costs. And I'm saying there's no cost causation analysis in FERC's order. And that would probably be okay if FERC was just rerunning stuff it had done before. But I think your point is that, no, FERC's not rerunning stuff it did before. FERC is doing something different here. This is a different scenario than Opinion 503, in which case it seems like you probably needed some cost causation discussion. Okay, I'm sorry. It's not a different scenario than 503. It seems like you should have applied 503's general rule that if you don't have firm rights, you don't pay violation-based costs. Okay, I think I understand, Your Honor. The commission is relying on those violation-based cost assessments that were done in 2007 to 2013. They were a just and reasonable allocation and use of the prevailing method at the time. So the commission did not feel it had to rerun the cost. I get that. So that's fine. But then why not, in that case, apply what FERC said at the time, which is if you don't have firm rights, you don't pay violation-based costs. Right. But I think, Your Honor, it's because Hudson had the firm rights at the time they were allocated, and we're just applying the tariff now. We're applying Section A-5, which says that those costs are fixed and they shall not be changed unless there is a specific exclusion from these particular allocations. Again, you know, the commission here, you know, is relying on the fact that it's not required to consider the cost allocation rules on a project-by-project basis. I think that was in the court's Long Island Power decision, 27 fed forth at 7-15. That would unravel the whole framework of these ex-ante tariffs. So the commission, you know, this is just like the New Jersey board case, where the result is just the result of a combined set of permissible circumstances that does not render any of these rates unjust and unreasonable. Thank you. Thank you, Your Honor. I'm John Longstreth for PPL. We're one of the transmission owners in PJM. Let me start at the end because, to Judge Walker's question, because I think it's absolutely consistent what's going on. What it says in Order 503 is, yeah, if you have firm rights, you get aside these costs. That's exactly what happened. Because they had firm rights, those rights were causing a violation, and under violation-based defects, they had to pay those. Now, if you're reading it and saying, okay, I don't have firm rights, they could have done that in 2010, they could have done that in 2011, they could have done that in 2012. Suppose in 2012 they decide to give up their firm rights. They're not responsible for any violation-based defects after that. But for the rights they had at the time those reliability projects were planned, violation-based defects said you've got to pay those costs, and you can't get out of them later the way you can with solution-based defects. I think it's absolutely consistent with 503. Let me ask about that. It seems like that argument relies on a distinction between allocating the costs and collecting the costs. It's fine if you think that that's an important line to draw, but that's going to cut against you when we get to B-10. I don't think so. No? No, I don't think so, because B-10 is just a different situation. I think when Judge Rao suggested, and I understand, FERC shorthanded it a little bit and we did a little bit in our brief. We just don't think B-10 really has anything to do with the situation, for example, you had in LIPA. In LIPA it was very clear that you had to be collecting at the time you had the firm rights. Here the firm rights, and, again, remember for violation-based defects, when you have the firm rights, PJM is planning ahead. So in 2010, 2011, they're planning for what's going to happen in 2015, and they're saying if you cause that, you cause that. We're building it for you. If you decide five, six, seven years later you want to get out of it, we built it for you back then, and that was the rule. That's the rule that applies. So that was the rule. That was the rule. And we talked about cost causation. Everybody understood that was the rule. I don't understand anybody's ever brought a cost causation case against violation-based defects. Cause is right in the violation. You are causing the problem. We are building this for you. Based on the rights you tell us that you're going to have. And that's another issue, too, when they talked about we didn't have firm rights, and I think even firm counsel did the full complement of rights. They had full rights at 2010, 2011, 2012. They came and said we're going to have these 320 kilowatts, and you're going to have to build for them. PJM doesn't know at the time they're building that, or ordering that to be built and planning it, that five, six, seven years from now they're going to give up their rights. They have to assume they have those rights going forward. So they're planning the project for those rights at the time that they have. So they absolutely did have the rights. It's just that they didn't exercise the rights until the facilities were actually built in 2015, 2016. And that's what happened here. It's a deferred payment. So, again, that's completely different from the LIPA case. In the LIPA case the problem was that even though the costs were accruing, and it didn't necessarily make a lot of sense that, you know, they're going to be accruing costs, but we can't collect them until FERC gets around to ruling on it. The problem was that's what the tariff said. Here it's absolutely not what the tariff says. The tariff says not that you have to be collecting at the time that they have firm rights, but that when we come to calculate your payments, we basically look to see the rights, and it's, what's the exact language, because he skipped over it, that have been awarded. We look at the rights that have been awarded. It's looking back language in that B-10, B-Roman 10-2 language. Completely different from the LIPA case. Okay. Thank you very much. Thank you. We have a few minutes on the line. Thank you. So much of this case can be resolved with three words, collection, actual, and assignment. There cannot be collection without actual firm rights. The provision that FERC relies on and that PPL rely on is about assignment, assignment of cost responsibility, different from collection. And the argument has been made, well, LIPA is a different case. I mean, we don't need, LIPA addressed the word collect and said it was unambiguous, but even if a LIPA decision had never issued, the plain text of the statute, the plain meaning, plain English meaning of the word collection supports our interpretation. As for the costs that were, we were not in service until 2013. And so at that time we paid $335 million for all violations that we could conceivably cause in order to connect to the PJM grid. Those caused violations have been paid for. We walked away from that investment. And I want to stress that that was not an easy choice. That was an enormous investment that we had to leave on the table to stop the bleeding from these additional assessments, these additional collections. So as a practical matter, if the FERC would Hudson want to go back to having firm rights in the grid that's going to be paying for them? Not under, certainly not under the conditions that prevailed when we had them during that period. It was an untenable position where we were just socked with massive costs, 600 million. Some costs for the Bergen Linden corridor project alone. It was most of the solution. I beg your pardon. Most of those were solution based costs, not these violations. Most of them to be sure, but we have 136 million in violation based costs here as well. And to go back to your quick, your points about opinion five Oh three, the understanding was when that issue that the only methodology was violation based defects at that time, the so-called fixed once and done allocation. And yet the opinion says, it says in so many terms that the merchant facility can take non firm rights and avoid those, those charges. That's exactly what we did. And I ask you, no, please. How does that 136 million that you mentioned compared to the actual benefit you received? So, so first of all, we, the benefits that we received from firm rights, we paid for in the time that we had firm rights. We're not asking for any sort of a refund at this point. We only have non firm rights. And that means an incidental benefit to participate in the daily spot market of, of for electricity. That's not a basis for allocating costs. Never has been. The seventh circuit said in the Illinois commerce case, we mustn't allow the incidental benefits tail to lag the primary benefits dog. Everyone who is connected to the grid can be said to be deriving some  And that's what we're doing. We're in the grid and yet they're not charged. They're not charged. Only the metric for charging a merchant transmission facility is firm transmission, withdrawal rights and FERC established that in opinion, number 503. I'm over my time. I'm happy to answer any other questions. Do you think that any of the arguments that FERC or the intervener may say. Are. Kind of precluded. Because FERC did not make them in. In its order. Yes, we, we heard which ones we heard today. I think it was a reference to joint appendix page 275. That's not a theory that's reflected in the orders under. Barred by Chenery. Thank you. He submitted.
judges: Rao, Walker, Childs